In the Matter of the Assignment of A. B. THOMPSON, A.
L. LUICK, Assignee, Appellee.

Chattel mortgages: DESCRIPTION: ADDITION TO STOCK OF GOODS. The
1    printed provision of an ordinary chattel mortgage of farm prop-
     erty, that the same shall cover all increase from said stock, will not
     be construed to cover additions to a stock of goods, or substitutes
     therefor, made in the ordinary course of a mercantile business. An
     intention, however, clearly expressed in the mortgage that it shall
     cover not only the existing stock, but additions and substitutions
     made in the ordinary course of business, is valid.

Same: INCREASE. It is not necessary that the increase of mortgaged
2    personal property have a corporate identity at, the time of the exe-
     cution of the mortgage to be covered thereby, but it must be at
     least the increase of property which the mortgagor then had and
     in which he had a present interest.

Same: STOCK OF GOODS: SALES AND ADDITIONS: RIGHTS OF PARTIES.
3    Where the mortgagor purchased a stock of goods from the mortga-
     gee, both living in the same town, and the mortgagor openly sold
     from the stock, replacing the same with other goods which were
     mingled with those mortgaged, apparently with the consent of the
     mortgagee, each was entitled to claim such share of the whole as
     the property to which each was entitled bore to the whole mass.

Same: CONFUSION OF GOODS: RIGHTS OF PARTIES. Where a loss occurs
4    from a confusion of goods the party causing the confusion must
     suffer, if he is unable to distinguish and separate his property.
        Where the confusion is by the consent of the parties the rela-
     tionship of the goods rests upon the agreement of the parties in-
     volved in the consent, and the presumption is that they are tenants
     in common.
        Where the confusion is tortious the loss will fall upon the party
     wrongfully creating the confusion, except where the property is all
     parts of equal value and ascertainable with respect to the whole,
     when each will be entitled to his own proportion; but the party
     chargeable with the wrongful confusion has the burden of distin-
     guishing his own property.

**Same.** Where the confusion of goods is innocent, by mistake or negligently done, the party causing the confusion must be able to designate his own property or he will lose the whole to the other party; but where the equities of the parties are equal and the confusion resulted from inevitable accident each party has a common interest in the whole to the extent of his contribution thereto.

**Same:** STOCK OF GOODS: MORTGAGE: SALES AND ADDITIONS: RIGHTS OF PARTIES. Where the mortgagee of a stock of goods consented to a sale therefrom by the mortgagor in the regular course of trade, and other goods were purchased by him and substituted for those sold, neither was entitled to the whole stock but to his share in proportion to his contribution thereto.
WEAVER, J., dissenting.

*Appeal from Wright District Court.*—HON. F. D. LETTS, Judge.

TUESDAY, JANUARY 27, 1914.

A. B. THOMPSON, having made a general assignment for the benefit of all his creditors to one A. L. Luick, the Ft. Dodge Grocery Company filed an application in said proceedings to have a certain mortgage executed to it made a first lien upon certain property in the hands of the assignee claimed to have been covered by and included in its mortgage. The opinion states the facts.—*Reversed* and *Remanded.*

*P. F. Nugent,* for appellant Ft. Dodge Grocery Co.

*Nagle & Nagle,* for appellee Belmond Savings Bank.

*W. E. Bullard,* for appellee Luick, assignee.

GAYNOR, J.—On the 27th day of October, 1909, A. B. Thompson purchased a stock of goods from the Belmond Savings Bank. At the time he purchased it, the stock invoiced at $3,900. At the same time, Thompson executed a mortgage to the Belmond Savings Bank, upon the stock of goods so purchased, to secure the payment of sixty-eight promissory

notes, dated on that day, each for $50; the first payable on the 27th day of November, 1909, and $50 on the same day of each month succeeding until all were paid, with interest at 6 per cent.  The property mortgaged was described as follows:

All my entire stock of grocery goods, consisting of glass and crockery, woodenware, confectionery in glass and boxes, including both glass and jars, trays and boxes; also all canned goods, cigars, smoking tobacco and tobacco of every kind; also all nuts and fruits, and all other things not enumerated, and such as are usually kept in a grocery store; all showcases, including candy and cigar cases; also all other fixtures and furniture as connected therewith; also gasoline lighting plant, scales, safe, short account system, refrigerator and oil tanks, delivery team, harness and wagon; all located on the E. 1/3 of lot 1, block 25, Belmond, Iowa.  (There was further provision in the mortgage as follows:)  All increase from said stock of whatever kind or nature.

After the purchase of said stock and the execution of the mortgage, Thompson commenced to do a retail business in the same building in which the stock was located, and continued to do business in the same store until the 31st day of October, 1911, at which time he made a general assignment of all his property, including the stock and property mortgaged as aforesaid, for the benefit of his creditors.

It appears that, at the time of the making of the deed of assignment, the property in the store building hereinbefore described, including the property in existence at the time the mortgage was executed, invoiced at $2,900.  The assignee of Thompson, under order of the court, sold all the property in controversy here; and at the February term, 1912, filed his report, in which he sets out the entire indebtedness of the estate and the assets in his hands, and asks that he be authorized and directed to pay to the Belmond Savings Bank the amount realized from the sale of the chattels claimed to be covered by the mortgage, and that said mortgage debt be first paid out of the proceeds of the sale of the stock claimed to be covered by

the mortgage.   To this portion of the report, the Ft. Dodge Grocery filed objections, alleging that the mortgage, at the time of the assignment, did not cover any of the stock then on hand; that, since the execution of the mortgage, and prior to the time of the making of the assignment, Thompson had been selling from said stock at retail, and had been replacing them with new goods, and that at the time of the assignment he had in the store an entirely different stock of goods than that upon which the chattel mortgage rested, and that the chattel mortgage itself did not cover additions to the stock, and did not cover stock placed in there after the making of the mortgage.

The mortgage on which the bank relies was evidently written on an ordinary farm mortgage.   After describing the stock of goods, it reads as follows:   "All increase from 1. CHATTEL said stock of whatever kind or nature, the MORTGAGES: description: above-described stock being kept in my addition to stock of goods. possession on ........ Section No. ........ Township No ........ Range No. ........ West of the 5th P. M. of Iowa"—indicating that this part of the mortgage was not considered of importance in making the contract between the parties.   There were blanks left unfilled as appeared in the instrument.   The word "increase" appearing therein, upon which the bank relies, was evidently not placed there by the parties for the purpose for which it is now contended it should be used.   Nor can we gather therefrom that it was advisedly placed there by the parties, but permitted to remain there because it was in the form of mortgage used.   If it had been the intent of the parties to give it the meaning that is now contended for, more apt words could be used to express that intent.   Indeed, we think that, if it had been the intent of the parties to make this refer to the substantive part of the mortgage, they would not have used the word relied on, but would have used the words "additions thereto," or substitutions therefor, made in the ordinary course of business.   We are satisfied that this word

"increase" cannot be given the meaning contended for by the bank.

In the deed of assignment made by Thompson, he described the property deeded as follows: "The entire stock of groceries consisting of groceries, canned and in glass, teas, coffees, spices, sugars, cereals, soaps, candies, and everything else connected with and pertaining thereto, as now kept and contained in the two-story building situated upon the east one-third of lot 1 in block 25 in the original town of Belmond; all showcases, fixtures and furniture contained in said building, above described, on the first floor thereof, together with one National Cash Register, one team of horses, delivery wagon, together with wagon and harness." There is no question made in this record as to the right of the bank to take precedence over general creditors of the assignor as to all property actually covered by the mortgage at the time of the assignment.

The contention is, on the part of the Ft. Dodge Grocery Company, that there was no provision in the mortgage covering after-acquired property or that created any lien in favor of the mortgagee upon any property in the stock which was placed there by the mortgagor after the execution of the mortgage; that the word "increase" does not cover after-acquired property, though the same was in fact acquired from the proceeds of the sale of the mortgaged property. This contention of the objector, the grocery company, must be sustained for the reason that at common law nothing could be mortgaged that was not in existence at the time of the mortgage and did not, at the time of the mortgage, belong to the mortgagor. This was founded on the rule that what a man has not got he cannot give; but this rule was somewhat modified so as to cover property in which the mortgagor had a potential interest or ownership at the time of the execution of the mortgage. Thus it has been held that the increase of stock mortgaged may be covered by the mortgage, though not in being at the time of the execution of the mort-

gage. Crops to be grown upon certain premises owned or controlled by the mortgagor may be mortgaged. The wool upon certain sheep owned by the mortgagor at the time of the execution of the mortgage may be anticipated in the mortgage. But it is essential that he own the thing out of which the nonexistent thing must proceed, or does proceed. Or, in other words, it has been held that he may sell or mortgage the natural and expected product, growth, or increase of his own property, and this is peculiarly good as to third persons, where the property is not delivered into the possession of the mortgagee, and where the only notice of the thing intended to be mortgaged, or covered by the mortgage, is the constructive notice given by the recording of the mortgage itself. In no sense can new goods, though purchased and paid for out of the proceeds of the old goods, be said to be the natural increase of, or proceeding from, the goods then in existence. The added stock is entirely independent of the old stock for its creation, development, growth, and existence. It is newly acquired property, in no way proceeding from the old, placed with the old stock, or among the old goods, by the hand of the mortgagor.

In Jones on Chattel Mortgages (4th Ed.) section 154, it is said: ''The fact that new goods were acquired by way of renewal of old goods on hand, or in substitution for them, or were paid for out of the proceeds of the old, has seemed, in a few cases, to be the ground upon which the mortgage has been sustained as a lien upon the new goods; yet this ground has been so often declared ineffectual to give the mortgage any validity as to goods subsequently acquired, that no exception to the general rule prevailing at law, requiring such mortgages, can be sustained. The courts have gone so far as to hold that a mortgage covering renewals and substitutions for the goods in stock covered by the mortgage would not, in law, give the mortgagee a right of action against the creditors, or subsequent mortgagee seizing them.''

In this state, the doctrine has been adopted that, in cases

of stocks of goods, a party may, by express terms, mortgage, and his mortgage may be made to cover, not only the stock then in existence, but additions and substitutions thereafter made in the ordinary course of business, and this is the doctrine in many of the states. But the intention to do so must be clearly expressed in the mortgage, so as to charge persons dealing with the stock with notice of that fact. We have not to deal with that question here, for no attempt was made to mortgage additions or substitutions.

The only reference in the mortgage to anything other than the property then in existence and described in the mortgage is found in the word "increase" thereof. The rule generally 2. SAME: increase. stated as to increase is that, while the increase itself intended to be mortgaged need not at the time have identity or separate entity, yet it must at least be the product or growth or increase of property which at the time has a corporal existence, and in which the mortgagor has a present interest, and which is covered by the mortgage. Supporting this doctrine see *Varnum v. State*, 78 Ala. 30; *Paden v. Bellinger*, 87 Ala. 575 (6 South. 351); *McCarty v. Blevins*, 5 Yerg. (Tenn.) 195 (26 Am. Dec. 262); *Minnesota Linseed Oil Co. v. Maginnis*, 32 Minn. 193 (20 N. W. 85); *Farmers' L. & T. Co. v. Long Beach Imp. Co.*, 27 Hun. (N. Y.) 89.

In *Phillips & Son v. Both*, 58 Iowa, 499, the chattel mortgage on a stock of goods contains this clause: "The said grantor to have the privilege of retailing said stock, but to keep up said stock as fully as it now is as nearly as possible." The court said: "Did the mortgage cover goods afterwards purchased and added to the stock on hand at the date of the mortgage? We think it did not. The rule in this state is that the chattel mortgage may be made to cover future acquisitions of property"—citing *Scharfenburg v. Bishop*, 35 Iowa, 60; *Fejavary v. Broesch*, 52 Iowa, 88; *Stephens v. Pence*, 56 Iowa, 257. The court further says:

An examination of these cases will show, however, that,

in such of them as involve mortgages upon stocks of merchandise, the mortgages expressly provide that future acquisitions to the stock shall be held as included in the mortgage. The mortgage in the case at bar makes no such provision. It is true it refers to a stock of boots and shoes and clothing, but it also schedules and describes the mortgaged goods. There were no goods mortgaged except such as are scheduled, because the language is that it is 'the property described in the following schedule.' It may be that the parties intended to include future acquisitions of goods. The provision that the mortgagor should keep up the stock would seem to indicate something in that direction. . . . The rule allowing property to be mortgaged which is not yet in being, or not owned by the mortgagor, has, in our opinion, been extended quite far enough without allowing it to be done by mere inference.

The second proposition submitted is whether or not the fact that the mortgagee permitted the mortgagor to sell the goods in the ordinary course of business, to purchase other goods and intermingle them with the property

3. SAME: stock of goods: sales and additions: rights of parties.

mortgaged (where the evidence showed that, at the time of the assignment, there was very little of the original property left) can the mortgagee, after the property has passed into the hands of the assignee of the mortgagor (where the assignment is made for the benefit of all the creditors), insist upon a right to appropriate all the property in the hands of the assignee to the satisfaction of his claim, on the theory of a wrongful intermingling and confusion of property?

The only evidence in the record is that given by the mortgagor, Thompson, and it is to this effect, that the stock, when purchased from the bank, was an old stock. "After I purchased the stock, I commenced to do business where the stock was located. I did a general retail business, and added to the stock by purchases. I cannot tell how much my purchases amounted to, but were pretty large. It would run to about $1,000 a month. Was in business three years. At the

time I purchased the store, it invoiced at $3,900. There was very little of the old stock on hand at the time I made this assignment. At the time I was running the business, I aimed to dispose of the old stock and replace it with new. There was very little of the old stuff left. I made no figure of it. I don't believe there was over a couple of hundred dollars worth of the old stock left. I never made any attempt to separate them. I turned it over in bulk.''

It appears that the mortgagor purchased this stock from the mortgagee. It appears that the mortgagee and mortgagor resided in the same town; that the mortgagor had been openly and publicly selling goods from this stock, and, we must presume, with the knowledge of the mortgagor. The mortgagee, in its mortgage, had retained no lien upon afterwards acquired or substituted goods. The mingling was evidently with the consent of the mortgagee. Can it claim goods not covered by the mortgage, on the theory that the goods mortgaged to it were wrongfully commingled with the goods upon which he had no lien, and which, but for his claim, would have passed, under the deed of assignment, to the assignee for the use and benefit of all the creditors?

The foundation of the doctrine of confusion of goods is the affording of protection to the innocent owner. The loss and inconvenience arising from such confusion is therefore upon the party who causes the confusion, and it is for him to distinguish and separate his own property or lose it.

4. SAME: Confusion of goods: rights of parties.

In Jones on Chattel Mortgages, section 483, it is said: ''Where the confusion of the goods has taken place by the permissive act of the mortgagee, he is not allowed to defeat the rights of the judgment creditor by claiming the goods under his mortgage. If, under such a mortgage, the mortgagee has permitted sale to be made by the mortgagor, and the latter afterwards makes an assignment for the benefit of creditors, and the assignee sells the goods, the mortgagee is entitled to only such part of the proceeds as come from

the sale of the goods embraced in the mortgage, and the burden is on him to show what goods, sold by the assignee, were subject to the mortgage lien. If he has allowed the goods mortgaged to be so intermingled with goods afterwards purchased as to prevent the ascertainment of those on hand when the mortgage was given, he must suffer the loss''—citing authorities.

It is said that four cases may arise in which there may be a confusion of rights involved in the confusion of goods: (1) Where the mixture is made by consent of parties. (2) Where it arises from the willful or tortious conduct of one of the parties. (3) Where it is made by unintentional mistake. (4) Where it is the result of inevitable accident.

Where the mixture is by consent of the parties, the relationship to the goods, after confusion, would rest upon the contract between the parties involved in the consent, and the presumption would be that they were tenants in common.

Where the confusion is tortious, the party whose wrongful conduct created the confusion must lose, but this rule has been modified in cases where the property is all parts of equal value, and the value of each part is ascertainable, with relationship to the value of the whole thing as produced by the confusion, and parties will be tenants in common," and each will be entitled to his own proportion, but every presumption and intendment is against the wrongdoer, against the party whose wrongful act produced the confusion, and the burden would rest upon him to distinguish his property, if possible, from that with which it has been intermingled.

Where, however, the intermixture is innocent, or by mistake, or even negligently done, where there is no willful fraud involved, the party causing the confusion would not lose his property, but he does not gain anything by it, and will be required, in order to protect himself, to point out and designate his property, or

5. SAME.

he loses the whole to the party with whose it is intermingled.

But where the equities of the parties are equal, and the confusion is the result of inevitable accident, the parties would have an interest in the whole mass to the extent of the contribution thereto of his property, or they would be tenants in common in proportion to the amount of property contributed to the confused mass.

Assuming, from the relationship of the parties, that the mortgagee consented to the mortgagor's selling the goods mortgaged, and purchasing other goods and intermingling them with the goods mortgaged, then, under the rule hereinbefore stated, the relationship to the goods of the parties, after confusion, would not entitle either to the whole, but to his proportionate share of the whole mass, and to such proportionate share of the whole mass as the property contributed by him thereto bears to the whole mass, and no more. So in this case the testimony disclosing that the mortgaged goods in question on hand at the time of the assignment did not exceed $200, the bank's right in the property would be such proportionate share of the whole amount as its property bears thereto, and this should be allowed to the bank under its mortgage, and this is equitable as between the bank and the other creditors, and we think, therefore, the court erred in holding that the entire proceeds of the stock should go to the mortgagee, and the decree of the court is therefore modified to the extent of allowing the mortgagee the proceeds of the sale of all property covered by the mortgage which remained in the possession of the mortgagee and was not mingled or confused with other goods, such as the showcases and other tangible property, and such a proportionate share of the proceeds of the whole stock of goods as the value of the mortgaged property therein remaining bears to the value of the whole mass; they being tenants in common in proportion to their respective shares.

6. SAME: stock of goods: mortgage: sales and additions: rights of parties.

The cause is therefore reversed and remanded; with directions to proceed in accordance with this opinion in the apportionment of the mortgaged property among the creditors of the estate.—*Reversed* and *Remanded*.

DEEMER, LADD, and WITHROW, JJ., concur.

WEAVER, J. (dissenting).—In my judgment there is no fair room to doubt that the parties to the mortgage intended and understood that the lien thereof would attach to any and all additions thereafter made to the stock of goods. The word "increase," though perhaps not one most ordinarily employed to express that idea, may yet be used for that purpose without notating any of the usages of our language. Among the definitions of "increase" given by the Century Dictionary in an "amount or number added to the original stock or by which the original stock is augmented; augmentation." Webster defines the verb "to increase" as "to make greater in bulk, quantity, or number; to add to." It will thus be seen that the language of the mortgage aptly expresses the idea of additions made to the mortgaged property.

In my judgment, the decree below should be *Affirmed*.